659 So.2d 1333 (1995)
LIFE INSURANCE COMPANY OF NORTH AMERICA, Appellant,
v.
Ewa A. CICHOWLAS, Appellee.
No. 93-1892.
District Court of Appeal of Florida, Fourth District.
September 6, 1995.
Robert D. McIntosh and Kimberly W. Cocalis of Fleming, O'Bryan & Fleming, P.A., Fort Lauderdale, for appellant.
Laurie S. Moss of Esler, Petrie & Salkin, Fort Lauderdale, for appellee.

*1334 ON MOTION FOR REHEARING

PER CURIAM.
We withdraw our previous opinion and substitute the following in its place.
Life Insurance Company of North America (LINA) appeals from a summary judgment awarding benefits to its insured's widow. We reverse because the insured did not satisfy the requirement, explicitly stated in the application, that he be still insurable on the effective date of the policy.
The one-page insurance application at issue asked five questions and required the applicant to sign under a statement reading in pertinent part,
To the best of my knowledge and belief, the information on this application ... is true and complete. I understand that the information is being relied on to issue insurance and that my insurance can be voided if any of the information I provide is not true... .
I further understand that, if my application is accepted, coverage will go into effect on the effective date shown on my certificate of insurance provided I am still insurable on that date and provided LINA receives my first premium payment during my lifetime.
It is undisputed that Mr. Waldemar Cichowlas answered all five questions truthfully "no" as of the application date, including one which asked if he had been hospitalized during the past five years and one which asked if he had ever had or been treated for several enumerated ailments including lung disease. It is also undisputed that Mr. Cichowlas was hospitalized for chest pains three days after filling out the application, some three weeks before the policy took effect. He had been having pains prior to his filling out the insurance application. As a result of his hospitalization, Mr. Cichowlas was diagnosed as suffering from chronic obstructive pulmonary disease. Mr. Cichowlas did not inform the insurance company of his hospitalization. The uncontradicted testimony on behalf of LINA established that Mr. Cichowlas was not insurable on the effective date of the policy because of the diagnosis. Mr. Cichowlas died three months later of other causes.
Mr. Cichowlas' policy contained a clause requiring that he be "still insurable" on the effective date of the policy. Clauses requiring that an applicant remain insurable between the filing of the application and the delivery of the policy have traditionally been approved by Florida courts. They are generally in the form of statements that the policy shall not take effect unless it is delivered during the continued insurability or sound health of the applicant. E.g., Mathews v. Metropolitan Life Ins. Co., 89 So.2d 641 (Fla. 1956); Gulf Life Ins. Co. v. Green, 80 So.2d 321 (Fla. 1955); Wolk v. Lamar Life Ins. Co., 202 So.2d 617 (Fla. 3d DCA 1967). Thus, as the evidence was uncontradicted that Mr. Cichowlas was not insurable on the effective date of the policy, the "still insurable" clause precluded recovery for appellee pursuant to its terms.
Reversed and remanded for judgment in favor of appellant.
GLICKSTEIN, J., concurs.
WARNER, J., concurs specially with opinion.
ALVAREZ, RONALD V., Associate Judge, dissents with opinion.
WARNER, Judge, concurring specially.
I agree that reversal for a judgment in favor of the appellant is required based upon the "still insurable" clause in the policy. However, I would also contend that the insured had a duty to update his application for insurance with the information that he was hospitalized and that his failure to do so was grounds for rescission of the policy.
Mr. Cichowlas clearly knew that he had been hospitalized, which would have required a change in at least one of the five answers upon which he understood that LINA was relying its decision whether to approve his *1335 application. Had LINA known of the hospitalization, the testimony reveals that LINA would have obtained the records and discovered the diagnosis. It is uncontested that LINA would not have agreed to insure Mr. Cichowlas had it known of the hospitalization and diagnosis.
The application itself is not the contract between the parties. It is only an offer for a contract of insurance. It sets forth the terms upon which the insurer can accept or reject the risk. See Rosin v. Peninsular Life Ins. Co., 116 So.2d 798 (Fla. 2d DCA 1960). Thus, a concealment of a material fact by non-disclosure in the interval between the application and the issuance of the policy may void the policy. See Massachusetts Bonding & Ins. Co. v. Hoxie, 129 Fla. 332, 336-37, 176 So. 480, 482 (1937) ("`A Policy of Life Insurance is not binding until the premium is paid  such a clause being contained in the application. And it is the duty of the assured to communicate to the Company, any material change in his health, in the interval between the application and the completion of the contract by the payment of the premium.'") (quoting Whitley v. Piedmont & Arlington Life Ins. Co., 71 N.C. 480). This is so because such information changes the terms of the offer before its acceptance.
That an applicant for insurance must communicate changes in health between the application and the issuance of the policy is not a novel proposition in insurance law. Indeed, the authorities are replete that there is a duty to disclose newly discovered matters which render the applicant's answers untrue. See Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1928); Jacobson v. Equitable Life Assur. Soc. of United States, 381 F.2d 955 (7th Cir.1967); Disposable Servs., Inc. v. ITT Life Ins. Co. of New York, 453 F.2d 218 (5th Cir.1971); 9 George J. Couch, Couch on Insurance 2d § 38:21, at 388 (1985) ("[T]here is a continuing duty on the part of an applicant to disclose newly discovered matters arising between the application for, and the confirmation of, the contract where they come to the applicant's knowledge and render his former answers no longer true."); 1A John A. Appleman et al., Insurance Law & Practice § 249, at 158-60 (1981) ("The rule there is that the insured must inform the company of any change in his physical condition of which he becomes cognizant after making application for the policy and prior to the delivery thereof. This duty to disclose any change of health may exist regardless of whether there is a provision in the policy requiring such disclosure.")
The general standard for accuracy by an insurance applicant is set forth in section 627.409(1), Florida Statutes (1989), which provides that incorrect statements shall not prevent recovery under a policy unless:
(a) They are fraudulent;
(b) They are material either to the acceptance of the risk or to the hazard assumed by the insurer; or
(c) The insurer in good faith would either not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.
There is no scienter requirement in the statute; even an unintentional misstatement will prevent recovery if it materially affects the risk or if the insurer would have altered the policy's terms had it known the true facts. Continental Assur. Co. v. Carroll, 485 So.2d 406 (Fla. 1986). It cannot be claimed that Mr. Cichowlas did not know of his hospitalization. And the uncontradicted testimony of a LINA representative in this case established that LINA would not have issued the policy to Mr. Cichowlas if it had known of his hospitalization and resulting diagnosis.
Disposable Servs., Inc. v. ITT Life Ins. Co. of New York, is analogous to this case. The applicant there had stated that he had consulted a physician only once in the past five years, for treatment of a bee sting, and that *1336 he had never been told that he had kidney stones or any kind of kidney disease, tumors or cancer. A clause in the policy provided that the policy would not take effect until "delivered and the first premium paid during the lifetime of the insured." At least two days before the first premium was paid, the insured consulted a doctor about lower back pain and weight loss, and the doctor told him that he probably had a kidney stone and needed to be hospitalized. The insurer's representative testified that knowledge of this alone would have caused it to reject the first premium check, so the Fifth Circuit found it unnecessary to analyze further the insured's condition (which included his death a few months later from cancer) or to decide the precise date of payment. The Fifth Circuit's decision in Disposable specifically noted that the policy did not contain a clause requiring that the insured be in good health at the time the policy became effective. Nevertheless, the court held that the insurer was entitled to a judgment as a matter of law because the insured had failed to disclose that representations made in his application were no longer true when the policy became effective on receipt of the first premium payment, and knowledge of the truth would have caused the insurer to refuse coverage. The opinion relies on Stipcich v. Metropolitan Life Ins. Co., and in a footnote, the court indicates that the Florida Supreme Court adopted principles of law similar to Stipcich in Massachusetts Bonding & Ins. Co. v. Hoxie.
The well-settled law required the applicant to correct his answers to the questions on the application based on new circumstances between the application and the issuance of the policy. He failed to do so, and the information omitted was material to the insurer's decision to issue the policy. Both for this reason and because Mr. Cichowlas was not insurable on the date of the policy issued, I concur in the reversal of the final judgment.
ALVAREZ, RONALD V., Associate Judge, dissenting.
It is not the function of the courts to rewrite agreements between the parties in order to provide for the creation and imposition of a duty which the drafter of the written agreement omitted. The life insurance consumer must be explicitly informed by the insurance company of all of the duties to which the insurance consumer is required to comply before the bargained-for contingency, i.e., death, occurs and coverage is denied.
This contract case should be decided upon sound and established principles of contract law. This case should not be decided upon either the principles of tort law or the standard operating procedures of a life insurance business.

I. THE AGREEMENT
I respectfully disagree with the majority opinions because they have the effect of rewriting language to the parties' agreement. Both opinions espouse the same requiem:
"Still insurable" creates upon the insured the continuing duty to update the insurance company with any changes in the insured's answers to any of the foregoing five questions and to provide all other information which may have a bearing on the question of whether you are "still insurable." This duty shall continue through and until the effective date of the policy.
The majority would impose this duty despite the following two matters. First, the agreement doesn't state that the insured has a duty to update the insurance company. Secondly, there exists in the agreement other provisions which create a vague and ambiguous document. Courts should not give into the temptation of subtracting or adding language to a contract in order to reach a result which may viscerally seem fair, but which is not supported by the written bargain struck between the parties.
The written agreement between the parties contains the term "still insurable" and additional language which when read together create an ambiguous or vague document. These words and sentences serve to confuse the insurance consumer as to the nature, extent and time period required for disclosure *1337 of health information. Why are these additional words and phrases not germane to understanding the agreement? Are these other words and phrases simply superfluous, phonetic filler or merely invisible? For example, the application informs the insured, in no uncertain terms, that the information contained in the application "is" the information upon which the company relies in order to issue the policy:
To the best of my knowledge and belief, the information on this application to the Life Insurance Company of North America is true and complete. I understand that the information is being relied on to issue insurance and that my insurance can be voided if any of the information I provide is not true.
Later in the textual gauntlet, a/k/a, the insuring agreement, which the insured must successfully understand and traverse in order to qualify for insurance coverage, the insurance company states again, in no uncertain terms, that if the information on the application "was not true," "was false," or "[i]f you want to correct [mind you, not "update"!] the information that you gave us on your application," the insured may write or call:
If the information on your application was not true... .
The application you signed is a legal document. If the information on your application was false and we relied on that false information and gave you insurance that you were not entitled to, we may treat your insurance as if we never issued it to you... .
We have attached a copy of your application to the certificate. If you want to correct the information that you gave us on your application, write to us or call us... .
(excerpts from the body of the certificate under the heading "Other Important Information You Should Know") (emphases added). From a reading of these portions of the agreement, a reasonable person could conclude that the insurance company is relying on the information contained in the application in order to decide whether to issue the insurance and if the information on the application "was" false or not correct at the time that the insured completed the application, the insured has one last opportunity to "correct" that information. However, the existence of the foregoing apparently does not present even a measure of concern to the majority who relies solely on the words "still insurable."
In rewriting the application for insurance, the majority and specially concurring opinions have created and imposed a duty upon the insured after his death that is neither created nor imposed upon the insured during his life by either the application, the policy or Florida statutory laws. Consequently, this court has denied recovery under the contract in question.

II. CONTRACTUAL RELATIONSHIP
The relationship between an insured and the insurance company is contractual. Central Mut. Ins. Co. v. Cropper, 296 So.2d 69 (Fla. 2d DCA 1974). It is a fundamental principle of our jurisprudence that parties sui juris, i.e., having the capacity to manage their own affairs, may make any contract they desire to make so long as it does not violate any law or public policy of the state. Trak Microwave Corp. v. Medaris Management, Inc., 236 So.2d 189, 193 (Fla. 4th DCA 1970); Foster v. Jones, 349 So.2d 795, 799 (Fla. 2d DCA 1977). The text of the policy is where the establishment of the rights and liabilities of the parties to an insurance contract must find their basis. Brown v. Travelers Ins. Co., 649 So.2d 912 (Fla. 4th DCA 1995).
It is a universal rule that it is neither the duty nor the responsibility of the courts to rewrite an agreement between private parties:
We conclude for the reasons hereinafter stated that in affirming the decree of the lower court, the legal effect was to disregard and conflict with the many decisions of this court  and the universal rule  to the effect that a court is not authorized to rewrite a contract of the parties... .

*1338 [T]he well settled rule [is] that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain.
Home Dev. Co. of St. Petersburg v. Bursani, 178 So.2d 113, 114, 117 (Fla. 1965) (citations omitted). The limitation on the court's authority to rewrite contracts extends equally to the creation and imposition of duties for which the parties did not bargain. This restriction on the courts applies whether the language was omitted either intentionally or because of an oversight when the matter goes to press:
Where a contract is simply silent as to a particular matter, that is, its language neither expressly nor by reasonable implication indicates that the parties intended to contract with regards to the matter, the court should not, under the guise of construction, impose contractual rights and duties on the parties which they themselves omitted.
Jacobs v. Petrino, 351 So.2d 1036, 1039 (Fla. 4th DCA 1976) (quoting Gulf Cities Gas Corp. v. Tangelo Park Serv. Co., 253 So.2d 744 (Fla. 4th DCA 1971)).
In Jacobs, this court quoted with approval from Gulf Cities Gas Corp. v. Tangelo Park Service Co., 253 So.2d 744 (Fla. 4th DCA 1971), which stands for the proposition that the courts should not impose contractual rights and duties on the parties which they themselves did not make part of the contract. The Gulf Cities court stated:
An analysis of the contract in question reveals that it contains no express contractual duty on the part of defendant Gulf Cities to provide gas to consumers within the subdivision for any specific duration. Nevertheless, the trial court apparently not only found a duty on defendant Gulf Cities to provide gas, but a duty that would endure for a period extending from the date of the contract through 27 September 1970... .
Where the language of a contract is ambiguous or unclear as to a particular right or duty, the court may receive evidence extrinsic to the contract for the purpose of determining the intent of the parties at the time of the contract. However, where a contract is simply silent as to a particular matter, that is, its language neither expressly nor by reasonable implication indicates that the parties intended to contract with respect to the matter, the court should not, under the guise of construction, impose contractual rights and duties on the parties which they themselves omitted.
Gulf Cities, 253 So.2d at 748 (citations omitted); see also International Expositions, Inc. v. City of Miami Beach, 274 So.2d 29, 30 (Fla. 3d DCA 1973). As noted above, the rules governing the construction of contracts allow the taking of evidence in order to determine what the parties intended at the time that the application was completed and submitted. However, in this case, the deceased insured would be at a most severe disadvantage to express his intention. Accordingly, under the facts of this case, this option in construction of a written document is not available.
The insurance company chose the language that it wished to place in the application. Had the insurance company considered the likelihood of a change in health status of the prospective insured to be of value in assessing the risk it was about to undertake, it could easily have included a written clause requiring the insured to report such changes:
But the contract was not so drawn, and there is no reason why the court should remake an artless contract in order to give it meaning and efficacy which its ineffective plain wording does not supply. A party who knowingly enters into a lawful contract which may be improvident as to him generally is not entitled to protection from the courts, which are not free to change his contract for him or to avoid the results thereof.
Florida Sportservice, Inc. v. City of Miami, 121 So.2d 450, 453 (Fla.3d DCA), cert. dismissed, *1339 125 So.2d 880 (Fla. 1960) (citations omitted). It is not for this court to save the insurance company from either its lack of foresight or its literary shortcomings. As most recently stated by this court in considering whether an insurance company's exclusion under the "Personal Liability" coverage of its policy applied equally to "Dwelling" coverage, which did not include such an exclusion:
For, when a carrier has such freedom over the coverages it will insure, the nonpresence of expressed intentions on discrete subjects should ordinarily be taken as intentional noninclusion of the intention. The absence of the expression should mean the absence of the intent.
Brown v. Travelers Insurance Co., 641 So.2d 916, 919 (Fla. 4th DCA 1994).
Unless the insurance company specifically includes a duty, term or condition in the writing that it authored, the duty, term or condition is not part of the agreement. Accordingly, this court should conclude that because the insurance company failed to ask for this information from the insured that the insurance company was not concerned about receiving this information.

III. CONSTRUCTION OF A VAGUE AND AMBIGUOUS DOCUMENT
In stating that the information contained in the application "is" the information upon which the company relies in order to issue the policy, and that if the information on the application "was not true," and if the information on the application "was false," and "[i]f you want to correct the information that you gave us on your application," and that the applicant had to be "still insurable," the insurance application was, at its strongest and best, vague and ambiguous as to who had the duty to provide post-application information. Accordingly, the term "still insurable" should be strictly construed against the maker or author and in favor of the insured. Prudential Property & Casualty Ins. Co. v. Swindal, 622 So.2d 467 (Fla. 1993); Regency Highland Assoc. v. Sherwood, 388 So.2d 271 (Fla. 4th DCA 1980), review denied, 397 So.2d 778 (Fla. 1981); Tannen v. Equitable Life Ins. Co. of Washington, D.C., 303 So.2d 352 (Fla. 3d DCA 1974); Brown, 641 So.2d at 922. If the insurer wishes to condition its contractual liability upon the insured's conformance with certain conduct, it must do so in clear, unambiguous language. National Merchandise Co. v. United Serv. Auto. Ass'n, 400 So.2d 526 (Fla. 1st DCA 1981).
This court should construe the application language so as to impose upon the insurance company the duty to inquire about the continued health of the insured. Since the insurance company failed to ask about the status of the insured's health from the time that the application was submitted until the policy was issued or delivered, the trial court's decision in favor of coverage should be affirmed.

IV. APPLICATION OF STATUTORY LAW
The specially concurring opinion states that "[t]he general standard for accuracy by an insurance applicant is set forth in section 627.409, Florida Statutes (1989)... ." This statute permits the insurer to avoid the consequences of its contract with the insured only "if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise." The statutory law does not impose upon the insured the duty to give information that the insurer has neither inquired about nor requested from the insured. Again, there is nothing in the application that "required" the insured to either state those matters about which the insured was asked no questions or to update the answers previously given.

V. NEITHER TORT LAW PRINCIPLES NOR OPERATING PROCEDURES OF A LIFE INSURANCE COMPANY SHOULD CONTROL
The specially concurring opinion has determined that Disposable Services, Inc. v. ITT *1340 Life Insurance Co. of New York, 453 F.2d 218 (5th Cir.1971), reh'g denied, 457 F.2d 972, cert. denied, 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314 (1972), controls the disposition of this case. In arriving at its opinion in Disposable, the Fifth Circuit Court of Appeals relied heavily on the Supreme Court's opinion in Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1928). Opinions of federal courts which interpret and apply Florida law are persuasive, but the courts of this state are not bound by such opinions. Department of Legal Affairs v. District Court of Appeal, 5th Dist., 434 So.2d 310 (Fla. 1983); State v. Dwyer, 332 So.2d 333 (Fla. 1976).

A. TORT LAW
Both Disposable and Stipcich suffer from the same impairments. They rely upon principles of tort law and the standard operating procedures of a life insurance company to decide matters which are properly susceptible to analysis solely through the application of contract law. For the reasons stated below, this court should not find the holdings in either Disposable or Stipcich to be persuasive or controlling.
Both Disposable and Stipcich involved a written agreement or contract of life insurance. The first handicap from which these two cases suffer is that they are decided upon the principles of tort law, rather than upon the principles of contract law that have been addressed earlier in this dissent. The court in Disposable followed the lead of the Supreme Court in stating that an applicant for life insurance owed a duty to inform the insurer of a material change in his health, which occurred subsequent to completion of the application for insurance, but prior to the effective date of the policy. Specifically, the Disposable court noted:
In the leading case of Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1928), the issue before the Supreme Court was whether an applicant for life insurance owed a duty of informing the insurer of a material change in his health, which occurred subsequent to completion of the application for insurance but prior to the effective date of the policy. The Court answered in the affirmative and gave the following reasons for compelling full disclosure by the insured:
Insurance policies are traditionally contracts uberrimae fidei and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option.
Concededly, the modern practice of requiring the applicant for life insurance to answer questions prepared by the insurer has relaxed this rule to some extent, since information not asked for is presumably deemed immaterial.
Disposable, 453 F.2d at 221 (citations omitted).
There is a fundamental boundary between contract and tort law. The law of torts creates and imposes duties upon society with the hoped-for result that the members of society will not cause harm to other members of society. On the other legal "hand," the law of contracts is designed to enforce the duties and responsibilities to which the parties agreed to be bound. Casa Clara Condominium Ass'n, Inc. v. Charley Toppino and Sons, Inc., 620 So.2d 1244, 1246 (Fla. 1993). Rather than attempting to push the square peg of tort law into the round opening of contract law, this court should rely upon contract law in deciding this case because we are dealing with a contract. Consequently, this court should not apply tort law principles and create duties for which the contracting parties did not bargain nor to which the parties agreed. Rather than performing the work that the insurance company should be doing, this court should require the insurance company to write its own policies.

B. STANDARD OPERATING PROCEDURE OF AN INSURANCE COMPANY
The second disability plaguing both Disposable and Stipcich is that they involved the *1341 operation of a life insurance business. In Stipcich, the Supreme Court said that "[i]nsurance policies are traditionally contracts uberrimae fidei." Stipcich, 277 U.S. at 316, 48 S.Ct. at 513. The term "uberrimae fidei," or utmost good faith, has its origins in marine insurance policy cases. As was, and in some cases remains, the majority of situations when dealing with marine interests, the objects to be insured, i.e., the vessel or its cargo, were many leagues or continents away from the insurance company's office at the time that the owner applied for insurance. Consequently, the insurer was unable to examine or inspect the objects to be insured before issuing the policy. Because of the great risk presented to the marine insurer, the courts decided that the proper operation of an insurance company necessitated that the insured have the duty to advise the insurer of every circumstance within his knowledge from which the loss may occur:
In marine insurance the risk was usually tendered and accepted when the vessel was on the high seas, where the insurer had no opportunity to examine her, or to know the particular circumstances of danger to which she might be exposed. The risk in such a case is highly speculative, and it is manifestly the duty of the insured to advise the insurer of every circumstance within his knowledge from which the probability of a loss can be inferred, and he cannot be permitted to escape the obligation by a plea of inadvertence or negligence.
Penn Mut. Life Ins. Co. v. Mechanics' Sav. Bank & Trust Co., 72 F. 413, 434 (6th Cir.1896).
Additionally and significantly, in order to impose upon the owner of the ship or cargo some duty that was not in the written agreement, the courts reasoned that the parties to marine insurance policies were most frequently involved in the procurement and sale of marine insurance. Consequently, since it was the business of shipowners and their brokers frequently to deal in insurance, they were presumed to know the usages prevailing with respect to contracts that they were constantly making. Id. at 437.
If this court is going to undertake to operate a life insurance company, let us operate that company based upon twentieth century considerations and technology and a mutuality in the exercise of the utmost good faith. The reasoning set forth in the marine insurance cases for the creation and imposition of a duty upon the insured that was not stated in the contract does not transfer readily to most consumers of life insurance. First, the person whose life is to be insured, unlike the ship or its cargo, is most often available for questioning, physical examination and medical testing by the insurance company. Secondly, if requested, the insured can update the insurance company as to each sniffle that occurs between the time that the application is submitted and the policy issued or delivered. This information can be made available to the insurance company within seconds, minutes or hours of the change in the insured's health. Fax machines, telephones and documents capable of being delivered the same day are all available to speed the insured's most recent health status report to the underwriters so that the latter might recalculate the risk of having to pay a claim pursuant to the policy that is to be issued. Thirdly, the purchaser of life insurance does not make a business of purchasing life insurance policies. For the great majority of purchasers of life insurance, such purchases are, no doubt, infrequent and annoying. The life insurance consumer is not acquainted with the "usages prevailing with respect to contracts that they were constantly making."
If the role of the courts is to implement the proper procedures for the operation of an insurance company, it is respectfully suggested that we leave the age of the four masted schooners and "Britannia rules the sea." The courts should enter the age of information, fast moving and plentiful as it is. However, a more proper and acceptable role for the courts to play in the business of insurance is that they limit their interest to the application of the appropriate legal doctrines to the insuring agreement.

VI. A MUTUALITY OF UTMOST GOOD FAITH
Each and every endeavor in which human beings participate should be executed with *1342 the utmost of good faith. If the court is to concern itself with the operation of a life insurance company business and impose upon the insured the duty of utmost good faith, this court must also impress upon the insurer the requirement of exercising the utmost good faith. Accordingly, this court should determine that the insurer failed to exercise the utmost good faith when it failed to inform the insured, either in express or implied terms, that it was the duty of the insured to communicate any changes in his health after the application was submitted, but before the effective date of the insurance policy. After all, and paraphrasing from Head and Kirkman's 1671 publication, English Rogue, II, sauce for the goose, is sauce for the gander.

VII. THE LEGAL TRAP DOOR
By formulating a duty that did not exist in the written insurance contract but which was based upon the operation of the insurance business, the courts have created a legal trap door through which the unsuspecting insured could fall to its insurance coverage demise. The more time that passes between submission of the application and delivery of the policy, the wider and longer becomes the trap door through which the insured could plummet and crash onto the floor of insurance policy voidness. Not informed of the duty to continually update the insurance company with his or her health status, the insured has no way of knowing that the chance that the policy would be voided increases with every passing day and with every change in health that occurs between submission of the application and delivery or issuance of the policy.

CONCLUSION
It is unfair to the insured to add a duty after his or her death that does not appear on the application. At the very least, the insured should have been told at the time of the completion of the application, and in clear and direct terms that:
It shall be the continuing duty of the applicant to notify the insurance company of any changes in the insured's answers to any of the foregoing five questions and to provide all information which may have a bearing on the question of whether you are "still insurable." This duty shall continue through and until the effective date of the policy.
If the insured complies with this clearly stated contractual duty and reports a change in health, the insurance company may either accept or refuse the undertaking of the risk. Based upon new or updated health information that increases the risk presented by the original application, the insurance company may inform the applicant during his lifetime that the insurance company will not insure him on the same basis as formerly proposed. Armed with that information, the insured will have the alternative of either agreeing to pay a higher premium if required by the same insurance company or inquire of other insurers whether they would undertake to insure the applicant. In this court's opinion, the insured has been left with no alternative.
In the future the insurance consumer, in order to be able to determine what duties he or she has agreed to under a similar application for life insurance, will be required to read the application, the policy and the court's majority opinions.